**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 23-cr-166 (DLF)** |
| | : | |
| **FIROZ PATEL,** | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America, by and though the United States Attorney for the District of Columbia, respectfully submits its Memorandum in Aid of Sentencing. The Court should sentence the defendant to a term of imprisonment and fine at the top of the applicable Guidelines ranges as calculated in the plea agreement—33 months of imprisonment and a $95,000 fine.

The defendant, a serial liar and cheat, engaged for years in a life of fraud and money laundering through Payza before perpetrating this new offense: obstructing the due administration of justice by hiding, laundering, and retaining over $24 million in illicit Payza-derived cryptocurrency—the proceeds of his underlying crime. His lies here were not just to enrich himself but to deprive the government of funds due to it under the forfeiture order; to rob the Court of the truth as it sought appropriately to conduct his sentencing; and to hide his contempt for the process and his complete absence of remorse and responsibility. To state the obvious, a lengthy prison sentence for the defendant's re-offense is well warranted. A high-end Guidelines sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a).

## BACKGROUND

### A. Introduction

On November 10, 2020, defendant Firoz Patel was sentenced to 36 months of imprisonment for his role in operating Payza, an illegal online money-transmitting business

responsible for transmitting more than $250 million in transactions.  As part of that sentence, the defendant agreed to forfeit "any property, real or personal," that was "involved in" the operation of Payza as well as $4,620,459.45 in funds seized from Payza.  The defendant eventually self-surrendered to prison on June 11, 2021.  But in the period between his sentencing and self-surrender, on April 27, 2021, the defendant transferred 450 Bitcoin (BTC) derived from Payza's operations—valued at $24,020,699.83 at the time—into a sham account opened under his father's name.  The defendant did so to conceal and shield those Payza-derived funds from forfeiture in his criminal case while he served that sentence.

## B.  Defendant's Operation of Payza

The defendant began operating the online money-transmitting business eventually known as Payza in 2004, when he and his brother, Ferhan Patel, founded AlertPay in Montreal, Canada.  *United States v. MH Pillars Ltd.*, No. 18-cr-53 (KBJ), ECF No. 91, at 2 (Firoz Patel's Statement of Offense).  AlertPay offered its services to customers across the United States, even though AlertPay lacked a license to operate in any state or the District of Columbia.  *Id.* at 4.  AlertPay received letters from numerous state regulators about its unlicensed money-transmitting activities, but the defendant allowed AlertPay to continue operating in those states.  *Id.*  Because of AlertPay's inadequate due diligence of its customers, AlertPay attracted criminals involved in a variety of illegal activities, including multilevel-marketing (MLM) scams, money-cycler scams (a/k/a "cyclers"), pyramid schemes, Ponzi schemes, and steroid distributors.  *Id.* at 2-3.  The defendant was aware that AlertPay was being used to transmit illegal proceeds, but he avoided cutting high-risk merchant customers for fear that a competitor would take them.  *Id.* at 2-3.

In 2012, the defendant acquired the UK company MH Pillars, and he transitioned AlertPay accounts to the new corporate entity under the name of Payza.  *Id.* at 5.  The defendant served as

the Executive Vice President of Payza and was the most senior person at the company during the course of its existence.  ECF No. 124, at 2 (Def. Statement of Offense).  Like its predecessor AlertPay, Payza hosted money-laundering services and Ponzi schemes on its site.  *Id.*  At the defendant's direction, merchants were not removed from Payza's platform despite their involvement in activities such as Ponzi schemes.  *Id.*  The defendant and others sanitized customer lists to remove known illegal merchants before producing that information to third parties requesting customer information.  *Id.*  Payza did not have a Bank Secrecy Act Officer, it did not conduct legally required Bank Secrecy Act/anti-money-laundering audits, and it operated in the United States at various times without registering with the U.S. Department of Treasury Financial Crimes Enforcement Network (FinCEN) or state authorities.  *Id.* at 2-3.

In 2014, Payza began accepting and processing payments through Bitcoin and other virtual currencies.  *Id.* at 3.  Payza, through an affiliate called Rook Finance Limited, contracted with the virtual currency exchange Coinapult to provide Bitcoin processing services.  Gov't Ex. (GX) 127.  Payza charged customers a varying fee for processing Bitcoin transactions.  ECF No. 124, at 3.  The defendant, through Payza, generated and obtained significant profits in the form of Bitcoin holdings.  *Id.*

### C.  Prosecution of the Defendant in the *Payza* Case

On March 8, 2018, the defendant and his co-conspirators MH Pillars Ltd. and Ferhan Patel (the defendant's brother) were indicted on counts of conspiracy to violate the prohibition against unlicensed money transmitting businesses, in violation of 18 U.S.C. § 371; conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956(h); operation of an unlicensed money-transmitting business, in violation of 18 U.S.C. § 1960(a); and money transmission without a license, in violation of section 26-1002 of the D.C. Code.  *MH Pillars Ltd.*, ECF No. 1.

On July 16, 2020, the defendant pleaded guilty pursuant to a plea agreement to one count of a superseding information charging him with conspiracy under 18 U.S.C. § 371 to operate an unlicensed money-transmitting business and to launder monetary instruments, based on his operation of Payza. *Id.*, ECF No. 81 (Information); ECF No. 90 (Plea Agreement). The defendant also submitted a Statement of Offense, made under penalty of perjury, and agreed to a Consent Final Order of Forfeiture. *Id.*, ECF No. 91 (Statement of Offense); ECF No. 101 (Consent Final Order of Forfeiture). During the pendency of the *Payza* case, the defendant was released on his personal recognizance and allowed to remain in Canada subject to basic conditions of release.

In that case, the defendant specifically agreed to forfeit any property involved in the offense to which he pleaded guilty, as well as any property traceable to the offense:

> (c) Your client agrees that this plea agreement permits the government to seek to forfeit any of your client's assets, real or personal, that are subject to forfeiture under any federal statute, whether or not this agreement specifically identifies the asset. Regarding any asset or property, your client agrees to forfeiture of all interest in: (1) any property, real or personal, involved in the offense to which your client is pleading guilty, and any property traceable thereto; and (2) any substitute assets for property otherwise subject to forfeiture. See 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(p).

*GX 205 (Defendant's Plea Agreement in Payza Case)*

> **NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**:
>
> 1. That the following property is declared forfeited to the United States: any property, real or personal, involved in the commission of Count One, and any property traceable to such property pursuant to Title 18, United States Code, Section 982(a)(1). The following specific

*GX 208 (Consent Final Order of Forfeiture in Payza Case)*

The defendant further agreed "to take all necessary actions to identify all assets over which [he] exercises or exercised control, directly or indirectly, at any time since November 2012." *MH Pillars Ltd.*, ECF No. 90, at 12.

On November 10, 2020, then-District Judge Ketanji Brown Jackson sentenced the defendant to 36 months of imprisonment to be followed by 24 months of supervised release.  *MH Pillars Ltd.*, ECF No. 136 (Judgment).  She also entered the forfeiture order ordering the forfeiture of "any property, real or personal, involved in the commission of Count One, and any property traceable to such property," as well as the forfeiture of $4,620,459.45 in seized "Payza funds."  *Id.*, ECF No. 132 (Final Consent Order of Forfeiture), at 4.

On February 4, 2021, the defendant moved to delay his self-surrender date by several months, citing health concerns arising from ongoing COVID-19 pandemic.  *Id.*, ECF No. 141.  Then-Judge Jackson granted the extension, and later granted a second extension based on difficulties encountered when the defendant attempted to enter the country from Canada.  *Id.*, ECF Nos. 144, 146, 147.  He eventually self-surrendered to Bureau of Prisons custody on June 11, 2021.

### D.  The Defendant's Obstruction Offense Conduct

Beginning around July 21, 2020—shortly after his guilty plea in *Payza*—the defendant started producing documents and records to the U.S. Probation Office as part of the presentence investigation.  Those documents included representations about his net worth and held assets.

On October 27, 2020, in response to a questionnaire asking him to identify all his assets, the defendant through his counsel sent an email to the U.S. Probation Office stating that "I have nothing to my name anymore" and that "[a]fter these charges, I lost access to all."  He claimed his "only" asset was $30,000 in a retirement savings account.  He further claimed to owe $14,834,312.00 in tax liabilities to Canada.   ECF No. 124, at 4.

5

**From:** Firoz Patel <fijmeister@gmail.com>
**Sent:** Tuesday, October 27, 2020 3:34 PM
**To:** Danny Onorato <DOnorato@schertlerlaw.com>
**Subject:** Net Worth statement and MH Pillars

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

The Networth Statement:

All points are N/A as I have nothing to my name anymore. After these charges, I lost access to all.

- I only have $30,000 from a Registered Retirement Savings Plan (RRSP)

- I have attached the 2018 Notice of Assessment for Federal Taxes owning at this current time.

*Oct. 27, 2020 email forwarded by defendant's counsel to probation officer*

The defendant also completed and initialed a "Net Worth Statement" for the U.S. Probation Office in which he claimed to have no assets, no anticipated assets, no trust assets, no business holdings, no bank accounts, no transfer assets, nor any assets to liquidate. *Id.*

### E. Laundering of the 450 BTC in Illicit Payza Proceeds

Unbeknownst to the government at the time, beginning in or around December 2020—shortly after his November 10, 2020 sentencing—the defendant began consolidating illicit Payza proceeds in his virtual currency account with the cryptocurrency exchange Binance, accumulating at least 500 BTC in his account by April 2021. *Id.* The Binance account was opened under the defendant's true name using his email address fijmeister[@]gmail.com. GX 401.

On or about April 22, 2021, Binance informed the defendant that his account was being closed for violating Binance's terms of service. ECF No. 124, at 4. Binance stated that the account had been flagged by a third-party compliance tool. *Id.* Binance gave the defendant three days to withdraw all funds from Binance before deactivating his accounts. *Id.*

**Tannya** (Binance)
Apr 23, 2021, 10:55 GMT+8

Dear user,

Thank you for your response.

We understand your frustration. However, we are not in the position to provide any additional details, except those that had been already provided in the previous email – your account has been flagged by a third party compliance tool and as a result, we are unable to serve you further in accordance with our Terms of Use.

Please withdraw all the funds as soon as possible.

---

FIND

mjmeister@gmail.com
Apr 22, 2021, 17:48 GMT+8

Hello

Is this for real?

Which term specifically from the terms of use has been violated from my actions?

---

**Tannya** (Binance)
Apr 22, 2021, 15:32 GMT+8

Dear client,

Thank you for your loyalty.

This is to inform you that due to the violation of our Terms of Use, we have taken a tough decision to terminate the service.

You may fully withdraw your funds, and we ask that you do it within the next 3 days. Afterward, your Binance account will be permanently deactivated.

If you have any issues with the withdrawal function, please notify the Binance Customer Support team as soon as possible.

We apologize for the inconvenience caused.

Your understanding is highly appreciated.

Sincerely,
Binance Team

*GX 314 (Binance notification of account closure due to a compliance issue)*

On April 25, 2021, the defendant created a virtual currency wallet on another cryptocurrency exchange, Blockchain.com, in an account domiciled in the United Kingdom. ECF No. 124, at 4-5. The account was opened in the name of the defendant's father but with the defendant's email address (fijmeister[@]gmail.com) and listed an address in Belize City, Belize, that was shared by several Payza shell companies. ECF No. 124, at 4-5; GX 449. From in or around April 2021 through June 2021, the defendant and others accessed computer servers in the United States, Canada, and India to access and perform transactions in this Blockchain.com account. ECF No. 124, at 5.

On or about April 27, 2021, the defendant transferred at least 450 BTC in illicit Payza proceeds, originating from his Binance account, into the Blockchain.com account under his control. *Id.* To do so, he accessed a Virtual Private Network (VPN) connection to access a computer server in the United States. *Id.*; GX 433.

On or about April 30, 2021, the defendant received an e-mail from Blockchain.com requesting "Know Your Customer" (KYC) verification information and requesting proof of the source of the funds deposited on April 27, 2021. ECF No. 124, at 5; GX 332.



Also, it appears that your personal information (name, last name, date of birth) that you have provided during registration does not match the information on your legal document. Can you please explain the following, by replying to this email:

- What is your full legal name?
- Who is ███████ and why was this name used during account setup process?
- What countries was your Blockchain.com account accessed from (if more than 1 country, can you please explain the reasoning for accesses from each country)?

*GX 332 (KYC Inquiry from Blockchain.com)*

The defendant in turn sent Blockchain.com's request to one of his Payza subordinates, V.T., and asked them to respond to the request. ECF No. 124, at 5.

**From:** Fij Patel <fijmeister@gmail.com>
**Sent:** 4/30/2021 3:33:26 PM
**To:** ▇▇▇▇▇▇▇▇▇▇
**Subject:** Fwd: [Blockchain] Re: Information request

Can you start on this? See the link below. Need that completed.

*GX 316 (Email from Defendant to V.T.)*

On or around the same date, April 30, either the defendant or someone assisting him identified themself as V.T. in a conversation with Blockchain.com and claimed that the defendant's father had initially created the Blockchain.com account. This individual stated that the account had been accessed from Canada, the United States, and India. This individual finally claimed that the BTC deposited in the account, in the name of the defendant's father, was loaned to him for the purpose of earning interest. ECF No. 124, at 5. None of the representations about opening the account, the reasons for opening it, or the funds' source was true.



Meantime to respond to your final questions...

- What is your full legal name? - V▇▇ T▇▇
- Who is ▇▇▇▇▇▇ and why was this name used during account setup process? - This was the name of the person who setup the account in first place. There was no way to change the name before I took over to my name for verification.
- What countries was your Blockchain.com account accessed from (if more than 1 country, can you please explain the reasoning for accesses from each country)? - Canada, USA, India. We are a group of friends, all indian nationals, that are doing business in India and also in Canada. Traders are in Canada.
- 
- The crypto currency was transferred from my friend's account, also at Blockchain.com who has loaned me the BTC to earn extra with. The BTC was purchased in years before (2015-2016) and was sitting in his Blockchain account for a few years, before it was then transferred to Binance to trade with, and then the extra brought back to Blockchain.

*GX 332 (Defendant and/or V.T.'s Response to Blockchain.com's KYC Inquiry)*

In June 2021, either the defendant or someone assisting him contacted Blockchain.com, identifying themself as V.T. while attempting to obtain access to the defendant's 450 BTC or more. ECF No. 124, at 5. On or about June 2, 2021, the defendant contacted Blockchain.com and falsely stated, "If this is about me, then realize that I am not beholden to any actions by the USA or any other government authorities. I have paid my dues and I owe nothing to anybody." *Id.*

A few days later, on or about June 11, 2021, the defendant reported to the Bureau of Prisons and began serving his sentence in the *Payza* case. *Id.*

A week after that, on or about June 18, 2021, V.T. began attempting to withdraw funds from the Blockchain.com account created by the defendant. *Id.* A few days later, on or about June 22, 2021, V.T. attempted to confirm his identity with Blockchain.com by providing his name, date of birth, email address, and physical address in India. *Id.* In response to Blockchain.com stating that the email and physical address provided were different than the account information, V.T. provided the defendant's email address and the defendant's home address in Canada. *Id.*

Soon thereafter, on June 23, 2021, the defendant filed a claim in his own name in a court in the United Kingdom against Blockchain Access UK (*i.e.*, Blockchain.com), abandoning the pretense that the funds belonged to anybody else:

 

*GX 221 (Claim Against Blockchain.com Filed on Behalf of the Defendant)*

On January 11, 2022, a United States Magistrate Judge in this district issued a seizure warrant for the BTC held by Firoz Patel at Blockchain.com.

### F. Defendant's Post-Offense Scheme to Evade Arrest

In the first half of 2023, the defendant was preparing for his release from Federal Correctional Institution Danbury at the conclusion of his sentence in the *Payza* case. Due to the First Step Act, the defendant anticipated his release would occur earlier than originally calculated, in or around April 2023. Aware of the government's investigation due to the seizure warrant and Blockchain.com freeze just discussed, the defendant enlisted the assistance of an associate, C.A.—a non-attorney who appears to have been providing quasi-legal advice to the defendant while he was incarcerated—in a scheme to forestall charges arising out of the 450 BTC transaction.

From in or around February 2023 through April 2023, the defendant made numerous recorded jail calls to C.A. in which the defendant directed the scheme. C.A. was to pose as a real attorney (V.B.) and engage in sham negotiations with the lead prosecutor on the case, former AUSA Arvind Lal.[1] The purpose of those negotiations with AUSA Lal, according to C.A., was to "keep him strung as long as I can" (GX 605)—in other words, to delay AUSA Lal from filing charges related to the 450 BTC just long enough for the defendant to be released from prison and escape to Canada. *See* ECF No. 83, at 2.

C.A. created the email account bevacqualaw[@]yahoo.com in the name of V.B. to effectuate this scheme. V.B. was prepared to testify at trial that he operated a small practice in New Jersey, had never heard of Mr. Patel, never engaged in negotiations with the United States Attorney's Office, and believed that C.A. had impersonated him through emails.

---

[1] C.A. has himself been convicted twice for the unlicensed practice of law and fraud. *See* https://www.njcourts.gov/system/files/court-opinions/2022/a0809-20.pdf; Alan Feuer, *Paralegal Sentenced in Fraud*, N.Y. Times, Oct. 16, 1997, at B1, *available at* https://www.nytimes.com/1997/10/16/nyregion/new-jersey-daily-briefing-paralegal-sentenced-in-fraud.html.

**Request Information**

| | |
|---|---|
| Target | S7W64PAIMMK27USZJXM37KL7ZA |
| Brand | yahoo |

**User Information**

| Attribute | Value |
|---|---|
| Other Identities | bevacqualaw |
| GUID | S7W64PAIMMK27USZJXM37KL7ZA |
| Mail Name | bevacqualaw@yahoo.com |
| Account Status | active |
| Registration IP Address | 173.3.32.129 |
| Registration Date | 2022-05-19T16:38:09.000Z |
| Full Name | V██████ B██████ |
| Address1 | |
| Address2 | |
| City | |
| State, territory, or province | |
| Country | |
| Zip/Postal Code | |
| Phone | |
| Time Zone | |
| Recovery Emails | cgalaw300@yahoo.com Unverified |
| Recovery Phones | ██████████ Verified on: 2022-12-13T17:22:31Z |

*GX 361 (Yahoo! Subscriber records for bevacqualaw[@]yahoo.com with cgalaw300[@]yahoo.com listed as the recovery email)*

**User Information**

| Attribute | Value |
|---|---|
| Other Identities | cgalaw300 |
| GUID | DLV6QJWWBBPGYLMAJIHFAWEW6Q |
| Mail Name | cgalaw300@yahoo.com |
| Account Status | active |
| Registration IP Address | 69.248.152.27 |
| Registration Date | 2010-05-03T20:58:21.000Z |
| Full Name | C████ A██████ |
| Address1 | |

*GX 363 (Yahoo! Subscriber records for cgalaw300[@]yahoo.com listing owner as C.A.)*

In a series of emails and phone calls at the direction of, and in agreement with the defendant, C.A. represented himself as V.B. to former AUSA Arvind Lal.

From: bevacqualaw@yahoo.com <bevacqualaw@yahoo.com>
Sent: Wednesday, February 22, 2023 12:02 PM
To: Lal, Arvind (USADC) <ALal@usa.doj.gov>
Subject: [EXTERNAL] Re: Firoz Patel

GM Arvind:

I have an attorney call set up with Firoz next week to discuss the situation after which
I will get back to you to update you.

Regards VB

On Tuesday, February 21, 2023 at 08:12:39 AM PST, Lal, Arvind (USADC) <arvind.lal@usdoj.gov>
wrote:


Good morning Vince. Just following up to see if you had a chance to talk to your client
Thanks Arvind


Arvind K. Lal

*February 2023 email exchanges between C.A. posing as V.B. in discussions with AUSA Lal*

From: bevacqualaw@yahoo.com <bevacqualaw@yahoo.com>
Sent: Monday, March 13, 2023 12:40 PM
To: Lal, Arvind (USADC) <ALal@usa.doj.gov>
Subject: [EXTERNAL] LEGAL CALL WITH PATEL

Hi Arvind:

Have not forgotten my promise to touch base with you; am having an extremely difficult time arranging for the phone call with Firoz (now in the 3rd week of attempting to arrange); most recent update (as of 3/13) from Danbury is as follows:

"Thank you for following up.  Your request has been forwarded to his assigned unit team.  They will contact you to coordinate this call.  It is important to note that FCI Danbury is not a pre-trial facility and legal calls must be prioritized.

Sabrina L. Moore, Acting Executive Assistant
Camp & FSL Unit Manager
Hispanic Affairs Program Manager
(203) 312-5336
email: slmoore@bop.gov"

Maybe you can rattle a cage or two to speed things up.

Regards

VB

*March 2023 email exchanges between C.A. posing as V.B. in discussions with AUSA Lal*

In a related scheme, the defendant attempted to have C.A. and the defendant's brother send "spoof" or "spam" emails about fictitious inmate release dates in order to "drown out" any legitimate notification of the defendant's release from prison.  GX 611.  Again, the purpose of the

scheme was to prevent the government from being alerted to the defendant's earlier-than-expected release date.  Some of the relevant jail calls are excerpted below.

*GX 601 (Feb. 23, 2023 call between the defendant and C.A.):*

> Defendant:    To your knowledge, upon release, if I'm not mistaken, my understanding is that the BOP notifies, I guess, everybody who was involved in the case on the inmate's situation at the time of release, is that correct?

>            * * *

> Defendant:    Yeah, so let's go with email address, because I think on all my notifications I've been getting from D.C. always has an email address for all the people involved, including, you know, Lal and all the other people like that.  OK, so they're going to get it.  I suppose in most cases they're just going to go, OK, delete, but you know because it's going to be so form, right, it's just a form email they're pretty much getting on a daily basis—

> C.A.:    Yeah, it would say something like, "Pursuant to the Smoodly Act of 1989, we're advising you that Firoz Patel is being released from federal custody on such and such a date."

> Defendant:    Exactly.  Now, you understand my concern with that, right?  In relation to everything else that we've been talking about?

> C.A.:    Yeah, OK, yeah I can see.

> Defendant:    Yeah, what can we do—is there anything that can be done, I mean, maybe that's a better question, is there anything that can be done to, you know, minimize that?

> C.A.:    I really don't know.  I'd have to check it out, that's all.

> Defendant:    Yeah, if you could, if you could check that out . . . .

*GX 604 (Mar. 20, 2023 call between the defendant and C.A.):*

> Defendant:    . . . You know how he told you last week, that if you don't get through then let us know?  That means that he's going to make a phone call, right?  Or they're going to reach out this way.

> C.A.:    Yeah, that was what I understood from his comment.

| | |
|---|---|
| Defendant: | Yeah, so what we're going to need to do, is you're going to need to do is somehow is you know, fine a way to delay that. Make sure that somehow this communication that seems like you guys are moving forward or at least somebody's reached out from here saying that we're setting out for this date—that date being some time, you know, like weeks from now. |
| C.A.: | So what do you want me to tell [V] to tell this guy, if he, cause we owe him another email this week?  What do you want me to tell [V] to tell him? |
| Defendant: | Nothing, uh, let's hold off another day, let's wait 'til tomorrow, see what happens, if not tomorrow then Wednesday at the latest.  And then after that I think we'll have a better plan for you of what to say. |
| C.A.: | OK. |
| Defendant: | All right, you know, but we've got to find something creative to, you know, even like that.  The main reason why is that I don't want them to reach out and find out that I'm long gone, that I'm gone. |
| C.A.: | I understand. |

*GX 611 (Mar. 20, 2023 call between the defendant and his brother Ferhan Patel discussing AUSA Lal and the "civil settlement negotiations" being orchestrated by C.A.):*

| | |
|---|---|
| Defendant: | Everything going on for the D.C. stuff there, so you know everybody that was involved in the case, you know, that includes like the prosecutors.  I'm saying everybody that was involved in the case including the prosecutor as well as our lawyers are all, they're all going to be notified by email of my exit. |
| Brother: | Oh really. |
| Defendant: | Yeah, so, you know, yeah that's why I was thinking you know we have to do something about that there.  So, uh, you know.  But talk to [C]; he'll explain to you what I'm thinking. |
| Brother: | OK, yeah, I'll reach out to him. |
| Defendant: | Yeah, get a copy of that particular email, headers and all. |
| Brother: | OK. |
| Defendant: | Yeah, you understand what I'm trying to do?  Yeah, sort of like— spam?  Hehe. |

Brother:      No, I don't understand.

Defendant:    No, spoofed?  Spam?  With a bunch of people's names, other people,
              also exiting, but not really?  Sort of like, drown me out in the
              process?

Brother:      OK, got it.

Defendant:    Got it?  All right.  So, yeah, so just work on getting that email, and
              all the headers and everything, so you know how to plan the next
              step, so it's easy enough to do after that.

Brother:      OK.  Does he know?

Defendant:    Uh, I already explained it to him.  He knows.  He doesn't quite
              understand it because it's, uh, beyond his understanding.

Brother:      This is pretty much, the date, it's going to be on the 14th at that
              point?

Defendant:    Yeah, whatever it is.  But I'm thinking don't just wait for the 14th.
              Do it even earlier.  You know, so like, mess it up.  You know, mess
              up everybody.

Brother:      There's no way of controlling that, it's like—

Defendant:    No, no, no, no, I'm talking about, for me it's going to be the 14th,
              but for other people—who are also being, you know, for that those
              offices are being notified that other people are being released.  Other
              people being "other people" in quotes, right?  So, sort of have to
              drown the—

Brother:      OK, let me talk to [C] about it.

Defendant:    Yeah, exactly.  I'm going to send you a letter with other instructions,
              but I'm giving you a heads-up right now.

                              * * *

Defendant:    So [C] knows what he's going to do.  Basically he's saying that I'm
              interested in a civil, you know, a civil settlement.  So he knows that's
              what we're going to work on.  But my thinking is that if he feels—
              I'm talking about "he" meaning Lal now—if he thinks that there's a
              civil settlement, like, opportunities, will he now jump the gun, if he
              finds out that I'm out now, will he jump the gun now and go
              automatically straight for an indictment?

Brother:          Yeah, that's obviously what the worry is.

*GX 605 (Mar. 23, 2023 call between the defendant and C.A.):*

Defendant:        Just a quick follow-up, any return, reply from Arvind [AUSA Lal]?

C.A.:             No, I just checked.

Defendant:        OK, that's—

C.A.:             I told, huh, [V] told him, it sounds good in theory, but the, the machinery's just broken, they just don't get back to you!

Defendant:        Yeah. But did you tell him the new date? Or not yet?

C.A.:             Did I tell him what?

Defendant:        The date, the date that was fixed.

C.A.:             No.

Defendant:        No, not yet, OK, that's what I was actually following up on, if you had sent him a date on, I think the 11th was the date that we were thinking that might actually work there? Yeah—

C.A.:             I'll, I'll, I'll keep him strung as long as I can, that's uh, [V], I'll tell [V] that.

Defendant:        Yes, that's fine. But I think if you actually tell him like the 11th as a fixed date, I think that's going to give you an idea, based off his reply, whether or not it's actually OK or not, or if he's impatient or not. It'll give you a good idea. The 11th is still like three weeks away, right?

C.A.:             Yeah.

Defendant:        Yeah, so, you might want to, you know, plug it and see what happens. Or not, you decide. But I'm just trying to find out whether or not, uh, I'm trying to get a gauge on what's going on. Does he even know all this FSA stuff is happening? Does he know that things are going to change, or not, or whatever? Is he keeping an eye on it? I don't know. It'll be good to know what's going on.

                           * * *

Defendant:    Yeah, you know, so just trying to keep his eyes away from looking at anything deeper like that.

## SENTENCING GUIDELINES

### A.  Statutory Maximums

Obstructing an official proceeding in violation of 18 U.S.C. § 1512(c)(1) carries a maximum sentence of 20 years of imprisonment; a fine of $250,000 or twice the pecuniary gain or loss of the offense under 18 U.S.C. § 3571(b); a term of supervised release of not more than five years under 18 U.S.C. § 3583(b)(1); mandatory restitution under 18 U.S.C. § 3663A; and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

### B.  Sentencing Guidelines Calculation

#### 1.  The Government's Guidelines Calculation

As calculated in the Plea Agreement, this offense level is calculated as follows:

| | | |
|---|---|---|
| USSG § 2J1.2(a) | Base offense level | 14 |
| USSG § 2J1.2(b)(2) | Substantial interference with administration of justice | +3 |
| USSG § 2J1.2(b)(3)(C) | Otherwise extensive in scope, planning, or preparation | +2 |
| | Offense Level: | 19 |
| USSG § 3E1.1(a) | Acceptance of Responsibility | -2 |
| | **Adjusted Offense Level:** | **17** |

The government agrees with the Draft PSR (¶ 64) that the defendant has one prior conviction, in the *Payza* case, 18-cr-53, for which he was sentenced to 36 months' incarceration. Under USSG § 4A1.1(a), he receives three criminal-history points, placing him in Criminal History Category II.  At offense level 17, the defendant's advisory Guidelines range is thus **27 to 33 months of imprisonment**, with an advisory Guidelines fine range of **$10,000 to $95,000**.

### 2.  Areas of Disagreement with the Draft PSR

The government respectfully disagrees with the Draft PSR's recommended application of the two-level obstruction enhancement in USSG § 3C1.1.  Here, the defendant is convicted of a substantive obstruction count, and the applicable guideline, § 2J1.2, already takes into account the aggravating circumstances of the offense.  Under Application Note 7 to § 3C1.1, the obstruction enhancement generally does not apply under such circumstances.

To be sure, Application Note 7 recognizes an exception if "a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself." USSG § 3C1.1, app. n. 7.  But that exception does not apply here. The Draft PSR focuses on the defendant's scheme to have his associate C.A. impersonate an attorney and attempt to mislead former AUSA Lal under the guise that they were negotiating a forfeiture resolution to the case. Draft PSR ¶¶ 47, 49.  The government agrees that this conduct was intended "to delay the Government from filing charges against the defendant," and thus "allow the defendant to "flee to Canada before formal charges in the instant offense were filed."  *Id.* ¶ 49.  At first blush, this conduct might appear to be the sort of post-offense, "further obstruction" that would trigger application of § 3C1.1's enhancement even where the defendant has been convicted of an obstruction offense.

This conduct, however, is not the type of obstructive conduct that § 3C1.1 aims to punish. The defendant's scheme was directed at delaying prosecution and avoiding arrest—not at covering up evidence or misleading investigators about the facts of the underlying criminal activity.  It is analogous to "avoiding or fleeing from arrest," which is one of the examples of conduct that "ordinarily do[es] not warrant application of this adjustment but may warrant a greater sentence within the otherwise applicable guideline range."  USSG § 3C1.1, app. n. 5.  Accordingly, while

the defendant's scheme with C.A. was egregious—and should "warrant a greater sentence" within the guideline range, *id.*—it does not trigger the two-level enhancement under § 3C1.1.

## SENTENCING RECOMMENDATION

### A. Sentencing Factors

While not mandatory, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *Gall v. United States*, 552 U.S. 38, 46, 49 (2007).  Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49.

Next, the Court should consider all the applicable factors in 18 U.S.C. § 3553(a).  *Gall*, 552 U.S. at 49-50.  The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a).  *United States v. Rita*, 551 U.S. 338, 347-351 (2007).  The section 3553(a) factors include, *inter alia*, the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(1)-(7). All these factors support the government's high-end Guidelines recommendation here.

**B. Sentencing Recommendation**

    **1. The Nature and Circumstances of the Offense**

The defendant's offense was as brazen as it was serious. The defendant laundered more than $24 million in illicit Payza-derived cryptocurrency after telling Probation that "[a]fter these charges," "I have nothing to my name anymore." And he did so after agreeing to forfeiture of "any property, real or personal, involved in the commission of" the Payza conspiracy to operate an unlicensed money transmitting business and to launder money. This fraud was perpetrated not just on Probation in the PSR drafting process, but upon the Court as it relied on these material misrepresentations in the PSR in fashioning its sentence.

The defendant engaged in meticulous and sophisticated cryptocurrency transactions to consolidate the Payza proceeds from multiple sources. After being kicked off the Binance exchange for compliance issue, the defendant moved these proceeds in an offshore cryptocurrency exchange account that he fraudulently opened in his father's name. He used his control over Payza's corporate infrastructure to perpetrate the fraudulent scheme, using the Belize City address shared by several Payza affiliates and enlisting one of his Payza subordinates, V.T., in efforts to further mislead Blockchain.com when it also flagged the transaction and account as suspicious. And after the funds were frozen and the defendant became aware of the law enforcement investigation into the 450 BTC, the defendant directed his associate C.A. to impersonate an attorney and engage in sham negotiations with the government in an effort to delay charges just long enough to allow the defendant to flee to Canada.

Several aspects of the defendant's offense stand out. First, his conduct represents brazen defiance of the sentencing Court's authority. Between his bald lies to Probation and the Court, and his careful efforts to launder and move the 450 BTC beyond the Court's reach, the defendant

demonstrated his contempt for the judicial forfeiture and sentencing process. Second, the defendant's offense was substantial in scale: 450 BTC in Payza-derived proceeds, worth more than $24 million at the time, far outweighing the several million dollars' worth of seized assets that the defendant otherwise forfeited at sentencing. Third, the defendant's actions were careful and deliberate, conducted over several months between his sentencing and his self-surrender—not an impulsive act or lapse of judgment. After learning that Binance closed an account in his name due to third-party compliance issues, the defendant adjusted his methods, moving his funds into an offshore account in his father's name and listing an address in Belize. And finally, the defendant's post-offense conduct in this case—including the attorney-impersonation scheme to avoid indictment, and the post-arrest scheme to hire a hacker to help him escape from pretrial detention—shows both consciousness of guilt and an utter lack of remorse. Each of these factors weighs in favor of a punishment at the top of the applicable Guidelines range.

### 2. The Defendant's History and Characteristics

The defendant is a recidivist who has demonstrated utter disrespect for the law. The defendant was given the benefit of the doubt in his first sentencing, in the *Payza* case. Then-Judge Jackson emphasized that she "would ordinarily be inclined to give both of you sentences at the top of the binding range given the extent and nature of your fraudulent activities"—referring to the defendant and his brother and co-conspirator, Ferhan Patel. *Payza* Sentencing H'rg Tr., at 91. But given the defendant's lack of criminal history, character letters, and "specific consideration and weight to Mr. Firoz Patel's family obligations which are significant given his wife's serious medical condition," Judge Jackson instead gave the defendant a mid-range sentence of only 36 months' imprisonment. *Id.* at 91, 93-94. Now, the defendant stands before the Court as a second-

23

time offender—having begun his instant offense while the ink was barely dry on his original plea agreement, starting with his financial misrepresentations to the U.S. Probation Office.

The defendant was no victim of circumstance.  He had a stable family upbringing and received the benefit of ample educational opportunities in his native Canada.  He has a record of economic success, entrepreneurship, and early adoption of emerging technologies such as cryptocurrency (as his criminal conduct in this case demonstrates).  The defendant's many advantages in life make his decision to resort to criminality, repeatedly, all the more difficult to understand. His motive seems to be simple greed.

Nothing in the defendant's history or characteristics supports a low-end Guidelines sentence, let alone a downward variance. The Sentencing Commission's policy statement makes clear that "[i]n sentencing a defendant . . . family ties and responsibilities are not ordinarily relevant in determining whether a departure may be warranted."  USSG § 5H1.6; *see also Koon v. United States*, 518 U.S. 81, 95 (1996) (characterizing family ties and responsibilities as a "[d]iscouraged factor[]" for purposes of departures); *United States v. Hughes*, Nos. 04-cr-445 (CKK), 05-cv-1990 (CKK), 2006 WL 2092634, at *8 (D.D.C. July 27, 2006) (reiterating principle that family ties are a "discouraged factor[]" post-*Booker*).  The government is aware of the defendant's wife's health challenges, but the defendant is not her primary caretaker, and the defendant's continued incarceration will not cause any loss in essential caretaking.

### 3.  The Seriousness of the Offense, Promoting Respect for the Law, Providing Just Punishment, Affording Adequate Deterrence, and Protecting the Public from the Defendant's Further Crimes

A significant period of incarceration and fine is necessary to reflect the seriousness of the defendant's offense, afford specific and general deterrence, and achieve the other sentencing goals. The defendant's actions here involved not just the concealment of criminal assets, but deception and lies, such as the defendant's brazen misrepresentations to the U.S. Probation Office and the

bold scheme to have an associate impersonate an attorney in negotiations with the United States Attorney's Office in emails and phone calls. These lies undermined the truth-seeking process of the sentencing proceeding—compromising the *Payza* sentencing court's ability to render a sentence based on a full understanding of the defendant's conduct and his history and characteristics. The sentence in this case should take into account the corrosive effect of the defendant's conduct—and send a message that obstruction in a sentencing and forfeiture proceeding is a serious crime that will not be tolerated.

The inherent difficulty of investigating and prosecuting such crimes of concealment also weighs in favor of a strong sentence. "Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994). This case presents a perfect example of such a high-stakes gambit: Had the defendant's scheme succeeded, he would have had 450 BTC plus interest in criminal proceeds awaiting him at the conclusion of his original jail term. The defendant would have benefited from Judge Jackson's lenience in sentencing based on his misrepresentations to the Court, and then had a pot of criminal proceeds awaiting him upon release—assets currently valued at over $47 million. The sentence here should discourage other defendants, especially defendants in financial-services or cryptocurrency prosecutions, from making a probabilistic calculation that the potential rewards of such obstruction outweigh the risks.

Like general deterrence, specific deterrence is also a critically important factor here. The defendant embarked on the instant criminal scheme before his sentencing in the *Payza* case was even complete (during the presentence investigation phase). That strongly suggests the sentence in the *Payza* case was insufficient to deter him from further criminal conduct. The defendant's

post-offense conduct only reinforces this point.  Rather than acknowledge responsibility when he became aware of the government's seizure warrant and investigation into the 450 BTC transaction, the defendant plotted to distract and delay the investigation just long enough to allow him to flee to Canada and escape arrest.  Incredibly, even after his rearrest in this case, the defendant *continued* to plot an escape from his pretrial detention by attempting to hire a hacker to secure his release. (That plot failed.)  The defendant, in short, is someone who has been utterly unresponsive to repeated law enforcement interventions—his prosecution and sentencing in the *Payza* case, the government's seizure warrant for the 450 BTC, and even his arrest in the instant case.

### 4. Avoiding Unwarranted Sentence Disparities Among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct

"The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."  *United States v. Otunyo*, 63 F.4th 948, 960 (D.C. Cir. 2023) (quoting *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009)); *see also Gall*, 552 U.S. at 52 ("As with the seriousness of the offense conduct, avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.  Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.").  A sentence within the Guidelines range is "presumptively reasonable." *United States v. Fry*, 851 F.3d 1329, 1333 (D.C. Cir. 2017).

The government knows of no similarly situated defendant and no factually analogous case involving the same elements as here, including the defendant's brazen disregard for the *Payza* sentencing court's authority, the deliberate laundering and concealment of criminal proceeds using cryptocurrency and offshore accounts, and aggravating factors such as the defendant's post-offense schemes to evade arrest and prosecution.

### 5.  Other Issues: Fine, Restitution, and Forfeiture

**Fine:** The government recommends that the Court impose a $95,000 fine, at the top of the Guidelines.  This fine is well supported by the § 3553(a) factors discussed above.

The burden rests on the defendant to show inability to pay a fine.  USSG § 5E1.2(a) ("The court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine."); *United States v. Sobin*, 56 F.3d 1423, 1430 (D.C. Cir. 1995) ("Under the Guidelines, [the defendant] bears the burden of establishing inability to pay.").  As the D.C. Circuit has noted, "it makes good sense to burden a defendant who has apparently concealed assets."  *Sobin*, 56 F.3d at 1430 (quoting *United States v. Anderson*, 39 F.3d 331, 358 (D.C. Cir. 1994)).

The defendant submitted a financial disclosure statement itemizing individual financial assets valued at $164,546, well in excess of the recommended Guideline fine of $95,000.  (Defense counsel has promised to provide supporting documentation but has thus far been unable to email the documents to government counsel due to their file size.)  Even accepting the defendant's representations as to the assets he has chosen to disclose, the government has substantial concerns about undisclosed assets—such as cryptocurrency assets over which the defendant may continue to exercise dominion and control.  Indeed, the defendant's offense conduct in this case involved concealing cryptocurrency under his control and lying to the U.S. Probation Office about his net worth and assets in the defendant's prior case (*Payza*).

Even the defendant's most recent representations to the U.S. Probation Office—that he only earned $7,646 monthly as the head of MH Pillars, d/b/a Payza—raise suspicions and call into question how he amassed proceeds exceeding $24 million in BTC based on a yearly salary of just $91,752. Draft PSR ¶ 99.  The defendant has retained private defense counsel in this case, in

addition to private counsel in his § 2255 proceeding and in his UK litigation.[2] He employed a fake attorney, C.A., in the attorney-impersonation scheme. And he even hired a purported hacker in exchange for cryptocurrency in an effort to compromise the computer systems at Northern Neck and escape from his pretrial detention. There is ample reason to be skeptical of the completeness of the defendant's current financial disclosure.

**Restitution:** The government is not seeking restitution. The defendant's obstruction was aimed at undermining the integrity of the court proceeding in the *Payza* case. This harm, though gravely serious, is not monetary in nature.

**Forfeiture:** The government's forfeiture recommendation and unopposed Preliminary Order of Forfeiture will be submitted in a separate filing.

## <u>CONCLUSION</u>

For the foregoing reasons, and based on the information reflected in the PSR and the overall record, the United States respectfully requests that the Court sentence the defendant at the top end of the applicable Guidelines ranges—33 months of imprisonment and a fine of $95,000—and enter the unopposed Preliminary Order of Forfeiture.

---

[2] The parties continue to investigate the status of the UK forfeiture proceedings in the original *Payza* case and will supplement the filings as soon as additional information is received.

Respectfully submitted,
EDWARD MARTIN JR.
UNITED STATES ATTORNEY
D.C. Bar No. 481866

BY:    */s/ Kevin Rosenberg* _____
       */s/ Christopher B. Brown* _____
       Kevin Rosenberg, Ohio Bar 0081448
       Assistant United States Attorney
       Christopher B. Brown, D.C. Bar No. 1008763
       Special Assistant United States Attorney
       U.S. Attorney's Office for the District of Columbia
       601 D Street, N.W.
       Washington, DC 20530
       (202) 809-5351 (Rosenberg)
       (202) 353-0018 (Brown)
       Kevin.Rosenberg@usdoj.gov
       Christopher.Brown8@usdoj.gov

       */s/ Jonas Lerman* _____
       Jonas Lerman, CA Bar No. 274733
       Trial Attorney
       National Cryptocurrency Enforcement Team
       Computer Crime & Intellectual Property Section
       U.S. Department of Justice
       1301 New York Ave., N.W., Suite 600
       Washington, D.C. 20005
       (206) 588-9582
       Jonas.Lerman@usdoj.gov